## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Gerald L.,                                    Case No. 20-cv-1352 (KMM/TNL)

      Plaintiff,

v.                                            **REPORT & RECOMMENDATION**

Kilolo Kijakazi,
Acting Commissioner of Social Security,[1]

      Defendant.

Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 890, Minneapolis, MN 55401; and Meredith E. Marcus, Daley Disability Law, P.C., 4256 North Ravenswood Avenue, Suite 104, Chicago, IL 60613 (for Plaintiff); and

Chris Carillo, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite 350, Mailroom 104, Dallas, TX 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Gerald L. brings the present case, contesting Defendant Commissioner of Social Security's denial of his application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*  This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 28, and the Commissioner's Motion for Summary Judgment, ECF No. 30.  These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable

---

[1] The Court has substituted Acting Commissioner Kilolo Kijakazi for Andrew Saul.  A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name."  Fed. R. Civ. P. 25(d).

Katherine M. Menendez, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **GRANTED IN PART** and **DENIED IN PART**; and this matter be remanded to the Social Security Administration for further proceedings.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in 2017 asserting that he has been disabled since December 2014 due to, among other impairments, an on-the-job injury, lumbar injuries, muscle spasms, and numbness.[2]  Tr. 85, 101, 104, 119.  Plaintiff's application was denied initially and again upon reconsideration.  Tr. 33, 100, 101, 118, 119.

Plaintiff appealed the reconsideration of his DIB determination by requesting a hearing before an administrative law judge ("ALJ").  Tr. 33, 143.  The ALJ held a hearing in January 2019, and issued an unfavorable decision.  Tr. 33-47, 54-83.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 23-26.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 28, 30.  This matter is now fully briefed and ready for a determination on the papers.

---

[2] Only Plaintiff's physical impairments are at issue.

2

### III. SEPARATION OF POWERS

As an initial matter, Plaintiff asserts that the structure of the Social Security Administration is "constitutionally invalid," Pl.'s Reply at 6, ECF No. 36, and "[t]he appointment of Andrew Saul as a single Commissioner of [the Social Security Administration,] who is removable only for cause and serves a longer term than that of the President[,] violates separation of powers." Pl.'s Mem. in Supp. at 17, ECF No. 29. Because "[t]he ALJ's delegation of authority in this case came from Mr. Saul," Plaintiff argues that the ALJ's decision is "constitutionally defective." Pl.'s Mem. in Supp. at 17; *see also* Pl.'s Mem. in Supp. at 19; Pl.'s Reply at 6. Plaintiff further argues that "the ALJ decided this case under regulations promulgated by Mr. Saul when Mr. Saul had no constitutional authority to issue those rules" and therefore "a presumptively inaccurate legal standard was utilized to adjudicate this disability claim at the administrative level." Pl.'s Mem. in Supp. at 18. Plaintiff requests that this case be "remanded for a de novo hearing before a new ALJ who does not suffer from the unconstitutional taint of having previously heard and decided this case when the ALJ had no lawful authority to do so." Pl.'s Mem. in Supp. at 19-20.

"Removal of the Commissioner of Social Security is governed by 42 U.S.C. § 902(a)(3)." *Lisa Y. v. Comm'r of Soc. Sec.*, 570 F. Supp. 3d 993, 1001 (W.D. Wa. 2021). Under § 902(a)(3), the Commissioner serves a term of six years and "may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." The Commissioner concedes, and courts have found, that "§ 902(a)(3) violates the separation of powers to the extent it is construed as limiting the

President's authority to remove the Commissioner without cause" following the Supreme Court's decisions in *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), and *Collins v. Yellen*, 141 S. Ct. 1761 (2021). Comm'r's Mem. in Supp. at 3, ECF No. 31; *see* Office of Legal Counsel, U.S. Dep't of Justice, *Constitutionality of the Comm'r of Soc. Sec.'s Tenure Protection*, 2021 WL 2981542, at *7 (July 8, 2021) ("In light of the Court's reasoning in *Collins* and *Seila Law*, we have reexamined the constitutional concerns that we previously raised about the Commissioner's protection from removal when Congress enacted the provision in 1994. We believe that the best reading of those decisions compels the conclusion that the statutory restriction on removing the Commissioner is unconstitutional."); *see, e.g.*, *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) ("The removal provision violates separation of powers principles. For the purpose of the constitutional analysis, the Commissioner of Social Security is indistinguishable from the Director of the [Federal Housing Finance Agency] discussed in *Collins* and the Director of the [Consumer Financial Protection Bureau] discussed in *Seila Law*."); *Lisa Y.*, 570 F. Supp. 3d at 1001 ("A straightforward application of *Seila Law* and *Collins* dictates a finding that § 902(a)(3)'s removal provision violates separation of powers. As in *Seila Law* and *Collins*, the Social Security Commissioner is a single officer at the head of an administrative agency and removable only for cause. *See* 42 U.S.C. § 902(a)(3). Section 902 thus has the same infirmity as the removal provisions at issue in *Seila Law* and *Collins*.").

First, Plaintiff's assertion that "[i]t is uncontested that the ALJ and the Appeals Council judges that adjudicated and decided this disability application pursuant to a

delegation of authority from . . . Saul" is not correct.  Pl.'s Reply at 7 n.1.  As the Commissioner points out, former Commissioner Saul "did not even assume office until June 2019, and the ALJ issued the decision on Plaintiff's claim on February 25, 2019," nearly four months earlier.  Comm'r Mem. in Supp. at 8; *see, e.g.*, *Andre J. B. v. Kijakazi*, No. 20-cv-2320 (SRN/HB), 2022 WL 2308961, at *10 (D. Minn. June 6, 2022) ("Commissioner Saul took the post on June 17, 2019, and held it until July 9, 2021."), *report and recommendation adopted*, 2022 WL 2307827 (D. Minn. June 27, 2022); *Lisa D. v. Kijakazi*, No. 8:21CV294, 2022 WL 952778, at *6 (D. Neb. Mar. 30, 2022) ("The court takes judicial notice that Andrew Saul was the Commissioner of Social Security from June 17, 2019, until July 9, 2021, when he was removed from that position by President Biden and Kilolo Kijakazi became Acting Commissioner."); *SSA Commissioners*, Soc. Sec. Admin., https://www.ssa.gov/history/saul.html (last visited July 20, 2022) (Andrew M. Saul).  The ALJ who adjudicated Plaintiff's claim held office under former Acting Commissioner Nancy A. Berryhill, who served as Acting Commissioner between January 21, 2017 and June 17, 2019.  *SSA Commissioners*, Soc. Sec. Admin., https://www.ssa.gov/history/berryhill.html (last visited July 20, 2022) (Nancy A. Berryhill).

In *Collins*, the Supreme Court distinguished between actions taken under an acting director who was removable at will from actions taken under a confirmed director who was removable only for cause by statute.  141 S. Ct. at 1781-83.  "[A]ny harm resulting from actions taken under an *Acting* Director[, who was not subject to a similar constitutionally defective removal restriction as a *confirmed* Director,] would not be

attributable to a constitutional violation." *Id.* at 1781 (emphasis added); *see id.* at 1782 ("When a statute does not limit the President's power to remove an agency head, we generally presume the officer serves at the President's pleasure."). A number of courts have concluded that § 902(a)(3) "does not restrict the removal of an Acting Commissioner, therefore, any harm resulting from the ALJ's actions taken under then-Acting Commissioner Berryhill would not be attributable to a constitutional violation and would not provide a basis for relief." *Jean P. v. Kijakazi*, No. 8:21-CV-200, 2022 WL 1505797, at *13 (D. Neb. May 12, 2022); *see, e.g.*, *Brown v. Kijakazi*, No. 1:20CV1035, 2022 WL 2222683, at *12-13 (M.D. N.C. June 21, 2022); *Standifird v. Kijakazi*, No. 20CV1630-GPC(BLM), 2021 WL 5634177, at *4 (S.D. Cal. Dec. 1, 2021), *report and recommendation adopted*, No. 3:20CV1630-JO-BLM, 2022 WL 970741 (S.D. Cal. Mar. 31, 2022); *Katherine M. v. Comm'r of Soc. Sec.*, No. C20-6023-MAT, 2022 WL 36891, at *10 (W.D. Wash. Jan. 3, 2022), *appeal filed*, No. 22-35201 (9th Cir. Mar. 7, 2022); *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *see also Collins*, 141 S. Ct. at 1787 ("We have already explained that the Acting Director who *adopted* the third amendment was removable at will. That conclusion defeats the shareholders' argument for setting aside the third amendment in its entirety." (citation omitted)). *But see Tafoya v. Kijakazi*, 551 F. Supp. 3d 1054, 1061-62 (D. Colo. 2021); *Dante v. Saul*, No. CV 20-0702 KBM, 2021 WL 2936576, at *8 (D. N.M. July 13, 2021); Thus, at least as to the ALJ, "Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who could be removed from that office at the

President's discretion." *Boger v. Kijakazi*, No. 1:20-CV-00331-KDB, 2021 WL 5023141, at *3 (W.D. N.C. Oct. 28, 2021).

Second, "[t]he Supreme Court held in *Collins* that an unconstitutional removal provision does not affect the *authority* of the underlying agency officials to act." *Kaufmann*, 32 F.4th at 849.

> In *Collins*, the Supreme Court held that where an unconstitutional statutory removal restriction exists, a plaintiff seeking relief on that basis must show that the restriction caused her alleged harm. The Court reasoned that the relevant agency officials were "properly appointed" pursuant to a statute that exhibited "no constitutional defect in the . . . method of appointment" and that "the unlawfulness of [a] removal provision does not strip [an official] of the power to undertake the other responsibilities of his office[.]" The Court continued that "there is no reason to regard any of the actions taken" by the agency during this period "as void."

*Alice T.*, 2021 WL 5302141, at *18 (alteration in original) (citations omitted). Thus, "an officer properly appointed may exercise the authority of his office even though the statute purports to grant him unconstitutional removal protections." *Andre J. B.*, 2022 WL 2308961, at *12; *see Jean P.*, 2022 WL 1505797, at *13 ("Even assuming the unconstitutionality of § 902(a)(3)'s removal provision, then-Commissioner Saul was permitted to undertake the responsibilities of his office, including the delegation of power to the ALJ and Appeals Council to decide cases." (footnote omitted)); *see also Collins*, 141 S. Ct. at 1788 n.23. Here, Plaintiff bases his constitutional challenge on the propriety of § 902(a)(3). He "does not dispute that the ALJ, the members of the Appeals Council, Acting Commissioner Berryhill, and Commissioner Saul, all served, at all relevant times, under valid appointments." *Kaufmann*, 32 F.4th at 849. Accordingly, Plaintiff's

assertion that the ALJ was without "lawful authority" to decide this case is without merit. Pl.'s Mem. in Supp. at 20; *see, e.g.*, *Kaufmann*, 32 F.4th at 849; *Hernandez v. Comm'r of Soc. Sec. Admin.*, No. CV-20-02070-PHX-JAT, 2022 WL 2286801, at *4 (D. Ariz. June 23, 2022); *Brown*, 2022 WL 2222683, at *14-16; *Andre J.B.*, 2022 WL 2308961, at *12; *Jean P.*, 2022 WL 1505797, at *13; *Lisa D.*, 2022 WL 952778, at *7; *Nudelman v. Comm'r of Soc. Sec. Admin.*, No. CV-20-08301-PCT-MTL, 2022 WL 101213, at *13 (D. Ariz. Jan, 11, 2022); *Lisa Y.*, 570 F. Supp. 3d at 1002-03.

Third, "[u]nconstitutional for-cause removal challenges alone . . . will not automatically serve to invalidate the ALJ's decision." *Nudelman*, 2022 WL 101213, at *13; *see Jean P.*, 2022 WL 1505797, at *14 ("The fact a party has been impacted by a decision of an agency that suffers from an alleged unconstitutional removal restriction does not mean that the actions or decisions of the agency are necessarily void or that the party is entitled to judicial relief."). "A party challenging an agency's past actions must . . . show how the unconstitutional removal provision *actually harmed* the party . . . ." *Kaufmann*, 32 F.4th at 849; *see Andre J. B.*, 2022 WL 2308961, at *12.

Like the claimant in *Jean P.*, Plaintiff "argues that the harm []he suffered was not receiving a constitutionally valid hearing, adjudication, or decision from either the ALJ or the Appeals Council." 2022 WL 1505797, at *14; *see* Pl.'s Reply at 9. But also like the claimant in *Jean P.*, Plaintiff "has not shown a clear connection" between § 902(a)(3)'s limitation on removal and "the ALJ's and Appeals Council's decision denying [his] benefits." 2022 WL 1505797, at *14. The harm Plaintiff alleges is essentially the same as his absence-of-authority argument, namely, all the actions taken by the ALJ and the

Appeals Council are void because of the removal restriction itself. As the Commissioner points out, "[u]nder Plaintiff's theory, he would be awarded a rehearing for no reason other than [§] 902(a)(3)'s existence, whether or not he can show that it's restriction on the President's ability to remove the commissioner had any effect on his benefits claim." Comm'r's Mem. in Supp. at 11. Absent "any causal link between the unconstitutional removal protection and the denial of [Plaintiff's] application," *Andre J. B.*, 2022 WL 2308961, at *12, Plaintiff "has not demonstrated that the removal provision caused compensable harm," *Jean P.*, 2022 WL 1505797, at *14; *see Kauffman*, 32 F.4th at 850 ("Nothing in the record suggests any link whatsoever between the removal provision and Claimant's case."); *Hernandez*, 2022 WL 2286801, at *4 ("Accordingly, because Plaintiff has not sufficiently alleged any actual, particularized harm and tied it to the unconstitutional statutory removal restriction in the Social Security Act, the Court declines to remand the case for a new hearing on this basis." (footnote omitted)); *see also, e.g.*, *Alice T.*, 2021 WL 5302141, at *18; *Lisa Y.*, 570 F. Supp. 3d at 1003-04; *Boger*, 2021 WL 5023141, at *3; *cf. Collins*, 141 S. Ct. at 1802 ("Consider the hundreds of thousands of decisions that the Social Security Administration (SSA) makes each year. The SSA has a single head with for-cause removal protection; so a betting person might wager that the agency's removal provision is next on the chopping block. But given the majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the President at all—would need to be undone. That makes sense. Presidential control does not show itself in all, or even all important, regulation. When an agency decision would not capture a President's attention, his removal authority could not make

a difference—and so no injunction should issue." (Kagan, J., concurring) (quotation and citations omitted)).

As Plaintiff has not met his burden to show that the removal protection in § 902(a)(3) affected the determination of his claim, the Court recommends that Plaintiff's motion be denied and the Commissioner's motion be granted as to his request for remand on the basis that § 902(a)(3) violates separation of powers.[3]

## IV. DISABILITY CLAIM

### A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see, e.g.*, *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021). The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion

---

[3] Accordingly, the Court declines to consider the other arguments advanced by the Commissioner, namely, harmless error, the de facto officer doctrine, the rule of necessity, and broad prudential considerations. *See* Comm'r's Mem. in Supp. at 12-18; *see, e.g.*, *Hernandez*, 2022 WL 2286801, at *4 n.1; *Jean P.*, 2022 WL 1505797, at *15 n.7; *Alice T.*, 2021 WL 5302141, at *19.

other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or

was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

## B. ALJ's Decision

In relevant part, the ALJ found that Plaintiff had the severe impairments of cervical and lumbar degenerative disc disease, right shoulder degenerative joint disease, and obesity, and none of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1. As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work[4] with the following relevant additional limitations:

> [Plaintiff] would need to alternate from sitting to standing for five minutes every hour. [Plaintiff] could not perform any overhead reaching bilaterally. [Plaintiff] could not climb ladders, ropes, and scaffolds. [Plaintiff] could occasionally climb ramps and stairs. [Plaintiff] could occasionally balance, stoop, kneel, crouch, and crawl. [Plaintiff] could occassoinal[ly] work at extreme cold, with vibrating machinery, or at unprotected heights. [Plaintiff] could not have the operational control of moving, dangerous machinery.

---

[4] As set forth in the regulations,

> [s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

Tr. 39.  Based on Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that Plaintiff was capable of performing the representative jobs of optical-goods polisher, circuitry-image inspector, and laminator.  Tr. 46.  Accordingly, the ALJ concluded that Plaintiff was not under a disability.  Tr. 46.

## C. Residual Functional Capacity

Plaintiff's challenges all concern the ALJ's assessment of his residual functional capacity at step four, including the ALJ's evaluation of the intensity, persistence, and limiting effects of his pain and the opinion evidence as well as the five-minute sit/stand limitation included by the ALJ.  *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("The fourth step in this analysis requires the ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).

### 1.  Medical Records

In mid-December 2014, Plaintiff fell several feet off of some scaffolding at work.  Tr. 592, 593, 431, 373, 1102, 1104, 1133, 1143, 1265; *see* Tr. 601; *see also* Tr. 773 ("fell on the cement floor"), 866 (reporting "pain began after a fall from scaffolding on to a cement floor"), 1222 ("[Plaintiff] finished setting a vent fan on the roof of a [motorhome] and then set about installing a fan shroud on top of the vehicle.  He says he grabbed his tools to install the shroud from the inside of the vehicle and went down the steps off the scaffold.  He says as he did so, his boot caught the bottom of the previous step, and he lost his grip on the railing, which caused him to fall to the floor, a distance of between four and six feet.").  An x-ray of Plaintiff's cervical spine showed "degenerative changes without evidence of acute traumatic injury"; there was "[n]o evidence of fracture or

dislocation." Tr. 1102; *accord* Tr. 1105, 1267. An x-ray of Plaintiff's lumbar spine similarly showed no evidence of "acute traumatic injury," fracture, or dislocation. Tr. 1103; *accord* Tr. 1104, 1265. "Mild degenerative disc space narrowing and lower lumbar facet arthritis" was, however, observed. Tr. 1103; *accord* Tr. 1104, 1265; *see* Tr. 1103 (noting "[m]ild lumbar spine degenerative changes"), 1104 (same), 1265 (same).

Plaintiff had moderate pain in his "[b]ilateral thoracic lumbar" spine, which was exacerbated by movement. Tr. 592; *accord* Tr. 431, 1106, 1109, 1153; *see also* Tr. 1134. Plaintiff had diffuse tenderness upon examination. Tr. 593, 432, 1107, 1110, 1154; *see also* Tr. 1134. Plaintiff was prescribed a "short course of pain medication" (hydrocodone-acetaminophen) and "muscle relaxants" (Valium[5]). Tr. 593-94; *accord* Tr. 432-33, 1108, 1110-11, 1154-55. In the days following the accident, Plaintiff's back pain increased and was persistent. *See, e.g.*, Tr. 1136-38, 1143, 1222.

Plaintiff has also struggled with weight management. *See, e.g.*, Tr. 434-43, 422-24, 397-98, 393, 471, 741, 1034-35, 1042, 1052, 1055, 1057.

### a.  2015

In early January 2015, Plaintiff had an MRI of his lumbar spine in connection with complaints of "low back pain." Tr. 363; *accord* Tr. 1114, 115, 1117, 1141, 1263. The MRI showed "[m]ild/moderate visual central acquired spinal canal stenosis pattern [at] L4-5 as a result of a slight broad-based disc bulge, facet arthropathy, and perhaps some mild ligamentum flavum thickening." Tr. 363; *accord* Tr. 1114, 1115, 1117, 1141, 1263.

---

[5] Valium is a brand name for diazepam, a medication that can be used to treat muscle spasms. *Diazepam*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682047 html (last accessed July 20, 2022).

There was also "[m]ild bilateral L3-4 hypertrophic facet arthropathy."  Tr. 363; *accord* Tr. 1114, 1116, 1118, 1141, 1263.

Towards the end of January, Plaintiff was seen by David W. Beck, MD, for complaints of bilateral leg pain and back pain.  Tr. 601, 1157-61.  Dr. Beck noted an "MRI scan shows a significant stenosis at L4-5."  Tr. 601; *accord* Tr. 1157, 1159, 1161. Upon examination, Plaintiff had normal strength in his upper and lower extremities.  Tr. 601, 1157, 1159, 1161.  "He ha[d] a very antalgic gait" and "[s]traight leg raising testing [wa]s equivocal bilaterally."  Tr. 601; *accord* Tr. 1157, 1159, 1161; *see also* Tr. 604.  Dr. Beck attributed Plaintiff's symptoms to his spinal stenosis and "recommended flexion exercises and epidural steroid injection."  Tr. 601; *accord* Tr. 1157, 1159, 1161; *see* Tr. 1156, 1158; *see also* Tr. 1156 ("I think he exacerbated a preexisting condition."), 1158 (same).  Dr. Beck noted that "[a]t the present time all positions hurt and so I don't think he can work."  Tr. 601; *accord* Tr. 1157, 1159, 1161; *see also* Tr. 1156, 1158.  Plaintiff subsequently underwent a lumbar interlaminar epidural steroid injection.  Tr. 362, 1166; *see* Tr. 602-03, 1151-52, 1262.

Around mid-February, Plaintiff returned to Dr. Beck without improvement.  Tr. 604; *see generally* Tr. 1123-28, 1168-69.  Plaintiff reported "bilateral leg pain and back pain whenever he moves" and stated that "he basically can't leave his apartment except to walk his dog, as he is absolutely miserable."  Tr. 604; *accord* Tr. 1168.  Dr. Beck recommended "a decompressive laminectomy" and cautioned Plaintiff that, due to his obesity, "recovery would be slower than somebody of normal weight."  Tr. 604; *accord* Tr. 1168; *see also* Tr. 1169 ("He has failed conservative therapy.  He cannot work and at

this point I would recommend a decompressive laminectomy.").   Approximately one week later, Dr. Beck performed back surgery to address Plaintiff's spinal stenosis at L4-5 with severe neurogenic claudication, including "L4 laminectomy, medial facetectomy, and foraminotomy bilaterally."  Tr. 359; *see* Tr. 354, 356, 607; *see also* Tr. 607-09, 1172-74.

In mid-March, approximately one month after his surgery, Plaintiff went to the emergency room with complaints of numbness in his legs, among other things.  Tr. 351; *see also, e.g.*, Tr. 589, 426, 606, 1083-84.  Plaintiff had numbness in his right leg "all the way down" and numbness in his "left upper leg down to [the] knee area."  Tr. 589; *accord* Tr. 426.   It was noted that Plaintiff was not currently taking "pain pills right now."  Tr. 351; *accord* Tr. 606.  Dr. Beck's examination showed "excellent strength" in Plaintiff's legs, notwithstanding his complaints of numbness.  Tr. 351; *accord* Tr. 606, 1171.  Dr. Beck ordered an MRI of Plaintiff's lumbar spine, which "show[ed] a wide open canal" with "no compressive lesions in [Plaintiff's] spine."  Tr. 351; *accord* Tr. 350, 606, 1170, 1171; *see* Tr. 353, 605, 1260.  Dr. Beck noted that the MRI "looked actually quite good."  Tr. 350; *accord* Tr. 605, 1170.  Dr. Beck prescribed Valium as a muscle relaxant and physical therapy.  Tr. 350, 605; *see* Tr. 612, 1170.

Around mid-April, Plaintiff had complaints of neck pain.  Tr. 349, 611, 1180, 1183.  Dr. Beck ordered an x-ray of Plaintiff's cervical spine, which showed "[m]oderate lower cervical degenerative disc disease, similar to that seen in December 2014."  Tr. 349; *accord* Tr. 1259.  An MRI of Plaintiff's cervical spine was also ordered.  Tr. 348, 611, 1180, 1257.  The MRI showed "C6/7 disc bulge with inferior central extrusion

creating moderate central canal narrowing"; "[t]iny, likely insignificant, central protrusion at C4/5"; and "RIGHT paracentral protrusion at C5/6 with mild central canal and moderate RIGHT neural foramen narrowing." Tr. 348; *accord* Tr. 1257. Dr. Beck noted that while the "MRI of [Plaintiff's] back shows some spondylosis," there [wa]s nothing surgical." Tr. 612; *accord* Tr. 1183.

Between the end of March and the end of June, Plaintiff attended 23 sessions of physical therapy. Tr. 371; *see* Tr. 371-92, 467-70, 479-86, 489-93, 496-501, 504-06; *see also* Tr. 852-56. Throughout his course of treatment, Plaintiff continued to experience pain in his lower back with muscle spasm, rating his pain as low as a 2 and as high as an 8 out of 10. Tr. 372, 373, 376, 384, 387, 484, 489, 490, 492, 505; *see also* Tr. 374, 375, 379, 381, 385, 389, 390, 479, 481, 485, 486, 491, 497, 498, 499, 506. Plaintiff's pain was "worse with sitting, walking or lying in bed, and better with the showers." Tr. 373. Plaintiff had "to constantly be changing positions to help with his discomfort somewhat." Tr. 373; *see* Tr. 385 (noting "he continually has to reposition whether he is sitting, standing, laying down"), 486 (same). Plaintiff reported that a car trip to visit his mother "really caused him some increased soreness" "through his tailbone area down into the hip regions." Tr. 380; *accord* Tr. 498. Plaintiff had "significant difficulty with progression of [his] exercise program, tolerating increased intensity or numbers of exercises." Tr. 379; *see* Tr. 387, 389, 470, 484, 500; *see also* Tr. 385, 491, 499. Plaintiff reported no improvement with physical therapy and, at the time of discharge, he was assessed as not having shown significant improvement. Tr. 371, 372, 492, 506, 516; *see also* Tr. 613.

At a follow-up appointment with Dr. Beck in early July, Plaintiff reported that "[h]e continues to be in a lot of pain especially when he moves," which "goes down his left leg." Tr. 614; *accord* Tr. 1188. Dr. Beck noted that "[n]eurologically [Plaintiff] has good strength," and the MRI "after surgery . . . looked just fine." Tr. 614; *accord* Tr. 1188. Dr. Beck stated that he believed Plaintiff has reached maximum medical improvement and "would put him on [p]ermanent restrictions of 4 hours a day, 20 pounds lifting and standing every 20 minutes." Tr. 614; *accord* Tr. 1188. Dr. Beck prescribed Percocet[6] and gabapentin[7]. Tr. 614, 1188.

During an appointment with his primary care provider in mid-September, Plaintiff reported that he was getting "back into his hobby interest of selling his toys on eBay." Tr. 413; *accord* Tr. 562. Plaintiff reported that he was "at his highest weight of 364 pounds" and found it "very difficult . . . to exercise now because of his back injury." Tr. 413; *accord* Tr. 562.

At the end of September, Plaintiff was seen in the interventional pain clinic at the request of Dr. Beck. Tr. 1212. Plaintiff reported that his "pain has been worse after surgery" and it was noted that Plaintiff was "quite dramatic in his telling of the current types of pain that he has and how it affects his life." Tr. 1212. Plaintiff's "pain ratings" were also noted to be "rather modest, stating that he is at a pain level of 3 with a best of 2 and a worst of 6." Tr. 1212. Based on a comparison of Plaintiff's pre- and post-surgery

---

[6] Percocet is a brand name for a medication consisting of a combination of oxycodone and acetaminophen and is "used to relieve moderate to severe pain." *Oxycodone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682132 html (last accessed July 20, 2022).

[7] Gabapentin is used to treat nerve pain, among other things. *Gabapentin*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007 html (last accessed July 20, 2022).

MRIs, it was noted that "[t]here appeared to be a hypertropic facet . . . at L4-5 on the left," which "ha[d] been removed on viewing the post[-]operative MRI." Tr. 1213.

    Upon examination, Plaintiff had

> generalized pain to palpation of his lumbar spine, but it is of a mild nature. The sacroiliac (SI) joints do not have much pain to direct posterior palpation. Flexion does increase his pain. Extension does not increase his pain. Rotation to the right or to the left does not increase his pain. Leg lengths are approximately equal. Straight leg raising is positive on the left with a worsening Lasegue test.[8] Straight leg raising is negative on the right with a negative Lasegue test. Deep tendon reflexes are absent to bilateral knees and absent to bilaterally [sic] ankles. Good strength to dorsiflexion and plantar flexion of his toes.

Tr. 1213-14. It was noted that "it took [Plaintiff] quite a bit of effort to go through any of these examinations." Tr. 1213; *see* Tr. 1212 ("Going through the motions such as getting up and getting on to the examination table take quite a bit of effort for [Plaintiff]."). A transforaminal epidural steroid injection was suggested, but Plaintiff ultimately declined the procedure based on his experience of increased pain following prior injections. Tr. 1214, 1217.

    In mid-December, Plaintiff told his primary care provider that "[h]e struggles with back pain on" a daily basis and it was "difficult for him to walk very long distances." Tr. 637. Plaintiff also reported that "[h]e was recently taken off of his Percocet and advised to take ibuprofen," which caused his pain "to get quite severe at times, making it very difficult for him to even walk." Tr. 637.

---

[8] *See infra* n.20.

### b.  2016

In mid-January 2016, Plaintiff told his primary care provider that he had "lost 15 pounds in the past 30 days" and was "trying to do as much exercise as he can."  Tr. 411; *accord* Tr. 650.  Plaintiff had "been going to the Y and swimming 2 to 3 days a week." Tr. 411; *accord* Tr. 650; *see also* Tr. 409 ("exercising for 45 minutes a day at the Y as well as has a[n] exercise bike at home that he is doing") (February), Tr. 659 (same).  He also purchased a stationary bike, but found "it difficult with his previous back injury, to maintain a lot of time on the stationary bike."  Tr. 411; *accord* Tr. 650.  Plaintiff was only able to "do about 4 to 5 minutes, but he is trying to increase his endurance."  Tr. 411; *accord* Tr. 650.

During a follow-up appointment with his primary care provider at the end of June, Plaintiff reported that "he finds it difficult to stay active because of his back pain" and had "not done any type of exercise due to his pain."  Tr. 397; *accord* Tr. 713.

### c.  2017

During an appointment to establish care with a new provider toward the end of January 2017, Plaintiff reported continuing to "experience low back pain which radiates to his left leg with muscle spasm."  Tr. 395; *accord* Tr. 732.  Plaintiff's back was positive for "lumbar spine tenderness."  Tr. 396; *accord* Tr. 732.  The "[p]ower in [his] left extremity [wa]s 4/5; his reflexes were "+2 bilaterally"; and straight-leg testing was

"negative bilaterally." Tr. 396; *accord* Tr. 732. Plaintiff was prescribed Flexeril[9] for his muscle spasm. Tr. 396, 733.

In September, Plaintiff was seen for, among other things, complaints of lumbar back pain and sciatica pain. Tr. 754, 1421. Plaintiff stated that the "pain in his lumbar back and radiation toward his left leg have never improved" following surgery and gabapentin did not provide any relief. Tr. 754; *accord* Tr. 1421. Plaintiff was "advised . . . to have physical therapy to strengthen the lumbar back muscles." Tr. 754; *accord* Tr. 1422. "[A]dvanced pain management" was also discussed and a referral for a pain-management consultation was made. Tr. 755; *accord* Tr. 1422. Plaintiff's gabapentin dose was also adjusted. Tr. 755, 1422.

At the pain-management consultation, Plaintiff reported persistent, fluctuating pain in his lower back which radiated into his left leg. Tr. 1253. Plaintiff's symptoms included aggravation with using stairs, bending, changing positions, daily activities, lying down, pushing, sitting, standing, twisting, and walking. Tr. 1253. His symptoms were "relieved by water and swimming pool." Tr. 1253. Upon examination, Plaintiff had tenderness in his lumbar spine and pain with extension and flexion. Tr. 1255. His range of motion was also "severely reduced." Tr. 1255. Plaintiff had full motor strength in his right lower extremity and between 3 and 4/5 on the left. Tr. 1255. It was recommended that Plaintiff have two caudal epidural steroid injections at two weeks apart. Tr. 1255.

---

[9] Flexeril is a brand name for cyclobenzaprine, a medication "used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries." *Cyclobenzaprine*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682514.html (last accessed July 20, 2022).

Between the end of September through the end of October, Plaintiff had approximately five sessions of physical therapy utilizing a TENS unit and pool therapy. Tr. 763-65, 768-69, 771-72; *see* Tr. 785, 846-47, 1423, 1428. During his initial session, Plaintiff reported that his pain was "quite severe." Tr. 763. Plaintiff's pain was in "his low back area and progressing down into both hips on a constant basis." Tr. 763. Plaintiff also "ha[d] some slight numbness on the top of his right leg through the thigh area and a shooting pain that occurs into the left leg down to the big toe." Tr. 763. Plaintiff rated his pain "anywhere from a 2 to 6 on a max scale of 10." Tr. 763. Plaintiff reported that "he has pain with walking, sitting or lifting of any kind" and "is only able to sleep 2 or 3 hours at a time before he is woken up because of the pain." Tr. 763. Over the course of his sessions, Plaintiff reported a decrease in pain with the TENS unit. Tr. 765, 768, 769. Plaintiff continued to be "frustrat[ed] with the current progress in his pain levels" and was assessed as "be[ing] severely limited with activity secondary to pain complaints." Tr. 772.

Plaintiff was next seen in follow up to his back and sciatica pain near the end of October. Tr. 773, 1425. Treatment notes indicate that Plaintiff was seen at the pain clinic and offered an epidural injection, which he elected not to do. Tr. 773, 1425. Plaintiff explained that "he had a bad experience with the injections in the back and would not like to consider another injection in his back." Tr. 773; *accord* Tr. 1425. Plaintiff continued "to have increasing pain in his lumbar back" with pain going "toward

his left leg," and reported no improvement with tizanidine[10] and Flexeril.  Tr. 773; *accord*

Tr. 1425.  An MRI was ordered "to look for any new or acute changes" and a

consultation obtained with a long-term pain management specialist.  Tr. 774; *accord* Tr.

1426.

In early December, Plaintiff consulted with pain management.  Tr. 866.  Plaintiff

reported constant pain in his lumbar spine that "radiate[d] to the left side (Pain radiates

from low back, across the left buttock, into the left hip area, and down the anterior thigh

in the L2-3 distribution.  This also extends from the knee over the anteromedial calf and

into the big toe.)."  Tr. 866.  Plaintiff rated his pain at a 4 out of 10, and reported that it

was "[e]xacerbated by: [s]itting, bending, lifting, twisting, driving, coughing, sneezing,

standing, walking, and lying down."  Tr. 866.

Upon examination, Plaintiff had "decreased range of motion, tenderness, pain and

spasm" in his lumbar back as well as "tenderness to palpation over his left sacroiliac

joint.  He was unable to perform a FABER maneuver due to pain."  Tr. 868.  Plaintiff's

gait was abnormal and his "lower extremity strength [wa]s somewhat limited due to

pain."  Tr. 868.  It was noted that "[t]here [wa]s significant give-way with resistance" and

the "[w]eakness seem[ed] to be due to [Plaintiff's] effort rather than true muscle deficit."

Tr. 868.  Plaintiff's "[p]atellar reflexes [we]re 2+ on the right side and 2+ on the left

side."  Tr. 868.  His "Achilles reflexes [we]re 1+ on the right side and 1+ on the left

side."  Tr. 868.  Lumbar x-rays and an MRI were ordered.  Tr. 868.  Plaintiff's

---

[10] "Tizanidine is used to relieve the spasms and increased muscle tone caused by . . . spinal injury."  *Tizanidine*,
MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601121 html (last accessed July 20, 2022).

gabapentin prescription was increased and he was prescribed "a trial of amitriptyline[11] at bedtime to help with the nerve pain and difficulty sleeping."  Tr. 868.  Plaintiff was also given a referral to a nutritionist for weight management.  Tr. 869.

Plaintiff consulted with a registered dietician a week later.  Tr. 878.  In relevant part, Plaintiff reported that his physical activity was "[l]imited due to pain."  Tr. 878.  It was noted that Plaintiff had "an exercise bike and can walk a little bit," and "used to walk 5 miles per day and had successful weight loss at that time."  Tr. 878.  Plaintiff was also "thinking about joining the Y . . . to use the track and pool."  Tr. 878.  Plaintiff was encouraged "to increase physical activity as he is able to promote weight loss."  Tr. 879.

### d.  2018

Plaintiff had a follow-up appointment with pain management in early January to discuss the results of his December 2017 x-rays and lumbar MRI.  Tr. 912, 1311-13; *see* Tr. 910; *see also* Tr. 892, 900.  Plaintiff reported continuing "pain in his lumbar back" and "off and on his pain shoots down his left leg."  Tr. 912; *accord* Tr. 1311.  Plaintiff was "working out [at] the YMCA 2 hours a day."  Tr. 912; *accord* Tr. 1311.  Plaintiff was also making "tremendous changes in his diet," but was still struggling with weight gain.  Tr. 912; *accord* Tr. 1311.  Plaintiff was informed that there were no "new or acute changes" on the MRI, although facet arthropathy was noted.  Tr. 914; *accord* Tr. 1313; *see* Tr. 900 (noting "[m]ild bilateral foraminal narrowing related to moderate to marked bilateral facet arthropathy" and "[m]ild narrowing of spinal canal related to minimal disc

---

[11] Amitriptyline is typically used to treat depression and "works by increasing the amounts of certain natural substances in the brain that are needed to maintain mental balance."  *Amitriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682388 html (last accessed July 20, 2022).

bulge and facet arthropathy" at L4-5 and "[n]o severe neural impingement"); *see also* Tr. 910 ("These imaging studies show osteoarthritis in the lumbar spine.  This is what is causing his low back pain.").  Plaintiff was not interested in any injections for his back and stated that "he would currently . . . keep working on exercises."  Tr. 914; *accord* Tr. 1313.  Plaintiff was also given a tramadol[12] prescription for "strong pain," but cautioned that "the tramadol is not for long-term use."  Tr. 914; *accord* Tr. 1313.  Plaintiff was additionally offered physical therapy and a neurology consultation if his symptoms got worse.  Tr. 914, 1313.

At a follow-up appointment with the registered dietician the following day, Plaintiff reported, among other things, that he "has been swimming and walking at the Y . . . for about 2 hours every week day."  Tr. 924.  Plaintiff reported that he felt he was "getting stronger."  Tr. 924.  His "[o]ther physical activity [was] somewhat limited due to pain."  Tr. 924.  Despite changes to his diet, increased exercise, and implementing other weight-loss strategies, Plaintiff continued to gain weight.  Tr. 925.  Plaintiff was provided with information regarding bariatric surgery and encouraged to obtain a consultation.  Tr. 925.

In late February, Plaintiff returned to Dr. Beck with complaints of continued back and left lower extremity pain.  Tr. 1087.  Dr. Beck noted that Plaintiff "ha[d] tried epidural, chiropractor, physical therapy, [and] Flexeril."  Tr. 1087.  Dr. Beck noted that Plaintiff had an antalgic gait and his strength was "good."  Tr. 1087.  An MRI "shows a

---

[12] "Tramadol is used to relieve moderate to moderately severe pain."  *Tramadol*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695011 html (last accessed July 20, 2022).

recurrent stenosis at L4-5" and Dr. Beck thought Plaintiff "might be a little unstable there." Tr. 1087. Dr. Beck further noted that Plaintiff was "morbidly obese" and he believed Plaintiff was "having current symptoms" as a result of his obesity. Tr. 1087. Dr. Beck noted that "[t]he surgical fix for this would be an L4-5 fusion, but I really am hesitant to do this because of his weight." Tr. 1087. Dr. Beck prescribed Decadron[13] in the meantime. Tr. 1087.

Plaintiff was next seen by Dr. Beck in early April. Tr. 1086. Plaintiff continued to have chronic pain in his back, and "occasional left leg" pain. Tr. 1086. Dr. Beck noted that Decadron did not help. Tr. 1086. Dr. Beck again noted that Plaintiff had "good strength in the lower extremities" on examination. Tr. 1086. Dr. Beck likewise again noted Plaintiff's obesity and his conclusion that "he is probably a little unstable at L4-5." Tr. 1086. Dr. Beck "had a long discussion with [Plaintiff]." Tr. 1086. Dr. Beck recommended that Plaintiff undergo a lumbar fusion, but have the procedure done "minimally invasive[ly]" "given his size." Tr. 1086. Dr. Beck encouraged Plaintiff to seek treatment elsewhere so that Plaintiff could have the procedure done sooner as his office would not "be offering minimally invasive surgery [until] after August." Tr. 1086.

In early July, Plaintiff presented to urgent care "for complaints of pain." Tr. 1349. Plaintiff reported ongoing back pain from his prior surgery and as well as "pain to his upper back and shoulder" for the last two months. Tr. 1349. Plaintiff also had a stiff neck with occasional "numbness and tingling . . . in his left hand," which had "got[ten]

---

[13] Decadron is a brand name for dexamethasone, "a corticosteroid," and is used in the treatment of inflammation and arthritis, among other things. *Dexamethasone*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682792 html (last accessed July 20, 2022).

worse over the last few weeks." Tr. 1349. It was noted that Plaintiff "g[o]t up slowly and appear[ed] stiff at [first] but then has a normal gait." Tr. 1350. Plaintiff's upper extremity reflexes were +1 bilaterally and his strength "strong and equal." Tr. 1350. Plaintiff was "using both hands moving around and [sic] during the evaluation." Tr. 1350. Plaintiff's sensation appeared intact, but he did "describe[] a tingling sensation to both his arms." Tr. 1350. "Spurling test negative on the right th[e]n on the left he did feel some tingling going down his left arm. Romberg negative." Tr. 1350. Plaintiff was offered a Toradol[14] shot, which he declined. Tr. 1351. Plaintiff was also given a prescription for Flexeril. Tr. 1351.

Plaintiff followed up with his regular treating provider a few days later. *See generally* Tr. 1352-55. It was noted that Plaintiff had "limited flexion extensions on the neck," and had normal strength in both his upper and lower extremities. Tr. 1353. It was recommended that Plaintiff undergo "physical therapy for his cervical neck" and, if there was no improvement, further testing could be done via MRI. Tr. 1354. Plaintiff was also advised to "avoid[] any heavy lifting." Tr. 1354. Plaintiff was additionally advised to continue performing stretching exercises for his back. Tr. 1354.

During his physical therapy intake appointment, Plaintiff reported "that any movement seems to increase his pain." Tr. 1357; *accord* Tr. 1363. Plaintiff rated his pain between a 5 and a 6. Tr. 1359, 1364. He was "not able to lift a [gallon] of milk from the refrigerator to the counter due to pain." Tr. 1357; *accord* Tr. 1363. Plaintiff

---

[14] Toradol is a brand name for ketorolac, a medication "used to relieve moderately severe pain in adults, usually after surgery." *Ketorolac Injection*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a614011 html (last accessed July 20, 2022).

reported that "if he leans forwarded to try to stretch and then sits back up he will have increased pain." Tr. 1357; *accord* Tr. 1363. Plaintiff also reported that he "does not have anyone coming into his home to assist him with anything." Tr. 1357; *accord* Tr. 1363. Plaintiff attended three sessions of physical therapy for his neck in July, consisting of exercises and electrical stimulation. Tr. 1356-69, 1373-75.

Plaintiff saw Dr. Beck again at the beginning of August. Tr. 1431. Dr. Beck noted that Plaintiff had "good strength [in his] upper and lower extremities" and his "[r]eflexes were normal." Tr. 1431. Dr. Beck stated that a cervical MRI would be ordered "[t]o clear the air." Tr. 1431. A referral was also made "for [a] possible percutaneous minimally invasive fusion at L4-L5 where [Plaintiff] had a decompression." Tr. 1431; *see* Tr. 330.

Plaintiff followed up with his regular treatment provider around the middle of August. Tr. 1376. Plaintiff "continue[d] to have pain in his leg and lower back" as well as persistent numbness in his fingers. Tr. 1376. Upon examination, Plaintiff was noted to have "[l]imited flexion extension in the lower back." Tr. 1377. He had normal strength in both of his upper extremities. Tr. 1377. Plaintiff also had normal reflexes in his upper and lower extremities and was "[a]ble to feel monofilament" with both of his feet and hands. Tr. 1377. A cervical MRI was ordered along with x-rays of Plaintiff's spine. Tr. 1378; *see* Tr. 1379-82. Plaintiff was advised "to continue to perform strength exercises for [his] lower back." Tr. 1378.

The x-rays of Plaintiff's lumbar and cervical spine showed degenerative changes, but "[n]o appreciable acute osseous injury." Tr. 1379, 1380. Plaintiff's lumbar spine had

"[d]egenerative changes [at the] L4, L5 disc space and facet joint levels."  Tr. 1379.

Plaintiff's cervical spine had "[s]cattered degenerative changes [at the] mid, lower

cervical spine."  Tr. 1380.  The cervical MRI showed "[m]ild multilevel cervical disc and

joint degeneration contributing to multifocal stenoses, most notably mild to moderate

right neuroforaminal stenosis at C5-6 where there is also a small perineural cyst."  Tr.

1382.

        At an appointment in early September, Dr. Beck again remarked that Plaintiff had

"good strength in the upper and lower extremities."  Tr. 1432.  Dr. Beck reviewed the

cervical MRI and noted that it "show[ed] a wide open canal."  Tr. 1432.  Plaintiff "ha[d]

a little synovial cyst at C4-5 [sic] on the right which is incidental."  Tr. 1432.  Dr. Beck

commented that "[t]here is really nothing alarming about his MRI and nothing surgical."

Tr. 1432.  Dr. Beck prescribed a home traction unit.  Tr. 1432-33.

        Plaintiff also met with his treatment provider in early October to discuss the

imaging results.  Tr. 1383.  Plaintiff was offered physical therapy or a referral to the spine

clinic for an injection to address the "new acute changes noticed on [the] [cervical]-spine

MRI," but declined both.  Tr. 1385.  Plaintiff similarly declined these options for

treatment of the pain in his lumbar spine.  Tr. 1385.  Plaintiff's Valium prescription was

refilled, but he was advised that this "medication is for short-term use only."  Tr. 1385.

Because of the continued numbness in Plaintiff's hands, he was referred to a physiatrist

for consideration of further diagnostic testing to rule out carpal tunnel syndrome.  Tr.

1385.  Approximately one month later, an order was placed for an electromyography

("EMG") to address the numbness in Plaintiff's upper extremities. Tr. 1389. Plaintiff was also given a referral to the spine clinic at his request. Tr. 1389.

The EMG study was completed in early December. *See generally* Tr. 1391-1417, 1272-96. The study showed "evidence of bilateral mild/moderate median neuropathies localized to the wrist, supporting the clinical diagnosis of mild/moderate bilateral carpal tunnel syndrome." Tr. 1396; *accord* Tr. 1277. Plaintiff was advised to modify his activities, perform "neural stretching exercises," and wear "carpal tunnel braces." Tr. 1396; *accord* Tr. 1277.

As for Plaintiff's back pain, there was "no clinical evidence of cervical myelopathy or red flags." Tr. 1396; *accord* Tr. 1277. Plaintiff did have "significant myofascial pain in the neck and upper back periscapular area particularly in the bilateral upper trapezius muscles and may consider trigger point injection and/or acupuncture treatment." Tr. 1396; *accord* Tr. 1277. It was also noted that acupuncture might help his lower back and left leg pain. Tr. 1396; *accord* Tr. 1277.

## 2. Opinions

### a. Dr. Beck

In July 2015, Dr. Beck completed a form in connection with Plaintiff's worker's compensation claim in which he indicated whether he agreed or disagreed with certain statements regarding Plaintiff's condition. *See generally* Tr. 1162-63. Dr. Beck agreed that Plaintiff's diagnosis was "[a]ggravation of spinal stenosis with back pain and bilateral leg pain" and Plaintiff reached maximum medical improvement as of July 1, 2015. Tr. 1162. Dr. Beck agreed that Plaintiff's condition was permanent and he would

have "permanent restrictions of: no more than 20 pounds lifting, working 4 hours per day, [and] standing for no more than 20 minutes." Tr. 1162. Dr. Beck subsequently agreed that these restrictions were "based on [Plaintiff's] subjective pain complaints" and that a functional capacity evaluation "would be beneficial in order to determine appropriate work and non-work medical restrictions." Tr. 1207-08.

In January 2017, Dr. Beck wrote a letter of support for Plaintiff. Tr. 599. Dr. Beck stated that he treated Plaintiff's lumbar spine and spinal stenosis, noting Plaintiff "had surgery for a decompression [i]n February 2015." Tr. 599. Dr. Beck stated that Plaintiff "continues to have back pain, mainly because of his morbid obesity." Tr. 599. Dr. Beck opined that, "[b]ecause of his complaints[, Plaintiff] should limit his sitting, standing, walking to 30 minutes at a time with breaks." Tr. 599. Dr. Beck additionally opined that Plaintiff "can lift up to 20 pounds frequently, handle objects, see, hear, speak, and travel." Tr. 599. Dr. Beck further opined that "[a] work environment is not a problem." Tr. 599.

### b. Dr. Kuhnlein

In January 2016, Plaintiff underwent an independent medical examination in connection with his worker's compensation claim. *See generally* Tr. 1221-31. The examination was performed by John D. Kuhnlein, DO, MPH, CIME, FACPM, FACOEM. Tr. 1221, 1231. In relevant part, Dr. Kuhnlein limited Plaintiff to

> 10 pounds lifting occasionally at all levels. With respect to nonmaterial handling restrictions [Plaintiff] would be capable of sitting, standing, walking on an as-needed basis. Rather than formal stand/sit restrictions to move every 20 minutes, I think it is reasonable to just simply allow [Plaintiff] to change

> positions based on his comfort levels. He can squat, bend,
> kneel or crawl rarely. Given the examination, I would not
> allow [Plaintiff] to work off ground level on ladders or on
> scaffolding. He can grip and down [sic] stairs but would
> more likely than not use a tandem gait, and would need a
> guard rail. He can work occasionally at or above shoulder
> height, including with manual or power tools that meet the
> material handling restrictions outlined above. He would not
> be able to operate foot operated machinery.

Tr. 1230; *see id.* ("He can use tools within the material handling restrictions outlined

above.").

### c. Dr. Matos

Towards the end of June 2016, Plaintiff had another independent medical

examination in connection with his worker's compensation claim. *See generally* Tr.

1232-52. This examination was completed by Peter G. Matos, DO, MPH, FACOEM.

FACPM, CIME. Tr. 1232.

Dr. Matos noted that Plaintiff's pain was "more consistent with the exacerbation

of a preexisting back condition" and that "[t]he medical literature shows that obesity is a

significant contributing factor to complications after surgery." Tr. 1233; *see* Tr. 1235.

Thus, Dr. Matos opined that Plaintiff's "on [sic] going back pain is more likely due to his

obesity." Tr. 1233; *see* Tr. 1235. Dr. Matos assigned no permanent restrictions as a

result of the accident, but did provide restrictions for Plaintiff's "ongoing personal back

pain." Tr. 1234.

Dr. Matos opined that Plaintiff could stand, sit, and walk occasionally, meaning

each activity for up to one-third of the day. Tr. 1234, 1251. Plaintiff could rarely lift up

to 20 pounds and rarely carry, push, and pull. Tr. 1234, 1251. Plaintiff could, however,

frequently lift 10 pounds or less.  Tr. 1252.  Plaintiff could reach occasionally and frequently use his lower extremities for foot controls.  Tr. 1234, 1251.  Plaintiff could also perform fine manipulation as well as simple and firm grasping frequently.  Tr. 1235, 1251.  Plaintiff could rarely climb stairs, stoop, kneel, crouch, and crawl.  Tr. 1234, 1251.

### 3.  Plaintiff's Function Report & Hearing Testimony

#### a.  Function Report

When asked in his function report to explain how his conditions affected his ability to work, Plaintiff stated that he was "unable to lift 20 lbs or more repetitively, pain, muscle spasms occur unpredicted, I'm at a pain level that does not stop until I sit down after walking 200 feet on ave [sic]."  Tr. 273.  Plaintiff also stated that Dr. Beck had placed him on permanent work restrictions.  Tr. 273.

Plaintiff reported that he lived alone in a house.  Tr. 273; *see* Tr. 59, 64.  When asked to describe his day, Plaintiff got up between 6:00 and 7:00 a.m.; ate breakfast; "accomplish[ed] house chore[s]," such as doing the dishes and laundry; sat on a heating pad as needed throughout the day; "pace[d] around to stretch/exercise as [his] back pain allow[ed]"; napped in the afternoon or laid down as needed; tried to exercise and be as active as he can; and watch movies.  Tr. 274; *see* Tr. 277, 70; *see also* Tr. 68 (napping three to four days a week for 20 to 30 minutes at a time).  Plaintiff took care of his small dog, and enjoyed reading, exercising, writing, and researching.  Tr. 274, 277; *see* Tr. 60, 69, 70; *see also* Tr. 623.

Plaintiff reported that muscle spasms affected his ability to sleep, including waking him up and making it difficult to fall asleep. Tr. 274; *see* Tr. 68. Plaintiff's back pain and neck stiffness also contributed to his inability to sleep. Tr. 274.

Plaintiff reported that his personal care took longer as he had to stop and start while alternating between sitting and standing. Tr. 274; *see* Tr. 1225. Plaintiff dressed slower or just wore the same clothes he had slept in; bathed a few times per week instead of every day; and shaved once a week or less. Tr. 274; *see* Tr. 1225. Plaintiff prepared meals in the microwave or snacked; he fried eggs occasionally. Tr. 274, 275; *see* Tr. 923. Plaintiff went shopping in stores for groceries and household items when needed, going out on average three times per week. Tr. 276; *see* Tr. 64, 70.

As for housework, Plaintiff cleaned and did laundry on a daily basis, alternating between standing and sitting, and took breaks as needed. Tr. 275; *see* Tr. 274. Plaintiff did need help with yardwork, such as mowing and shoveling; changing light bulbs; and cleaning floors. Tr. 275; *see also* Tr. 623.

Plaintiff reported that lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair-climbing all aggravate the pain in his lower back, requiring him "to either rest or sit." Tr. 278. Plaintiff estimated that he could walk a "couple hundred feet" before he needed to rest for 5 to 20 minutes. Tr. 279; *see* Tr. 1225.

**b. Hearing Testimony**

At the hearing, Plaintiff testified that he has trouble going up and down the stairs at his two-story home. Tr. 59. Plaintiff "need[ed] to use the railing, [to] hold [him]self up[ and] support [him]self going down." Tr. 59. Plaintiff also took "one step at a time."

Tr. 59.  Plaintiff "[v]ery rarely" took his dog on walks, and just let the dog out in the yard.  Tr. 60, 70.  When asked about his ability to drive, Plaintiff stated that he needed to take breaks to get out and stretch after 50 to 55 miles, but did not drive that far more than once per month.  Tr. 60, 64.  Plaintiff also had to switch between his hands and make fists while driving on account of numbness.  Tr. 60, 64-65.  Plaintiff testified that he spent the day "either pacing around, sitting, laying."  Tr. 70.  Plaintiff testified that he performs stretching exercises in bed and it was hard for him to do some of the other exercises that required standing "because they create more pain."  Tr. 71

Plaintiff testified that he no longer sold toys on eBay on account of the difficulties with his hands.  Tr. 61.  Plaintiff also testified that he did not often watch movies and had given up on his hobby of writing a book and performing research for the book.  Tr. 70-71.  Plaintiff also testified that he wore carpal tunnel braces on his hands at night and occasionally during the day "just to hope for improvement."  Tr. 67.  Plaintiff testified that he had a follow-up appointment scheduled to talk about a carpal tunnel release.  Tr. 65.

When asked about how his conditions affect his ability to work, Plaintiff responded:

> I've got a dull ache in both of my hips.  My lower L4-L5 are bone on bone.  Failed back surgery.  I do need a fusion.  In my neck I've got three bulged discs.  I've got two, possibly three cysts on my spine.  I have signs of stenosis in both the cervical and lower back.  I get a lot of tingling, my arms, hands grow cold.  There are times occasionally that it's hard to grip and hold on to things.  When I walk.  This I don't know how to explain.  My left leg feels a little bit different to my right leg, kinda, I think I've described it as kind of like an

35

> air balloon, it's hollow.  Sometimes I just have to trust that
> it's there.  When I lay down at night, I have muscle spasms.
> When I get up in the morning, I have muscle spasms and they
> are hard to deal with.

Tr. 63.  Plaintiff testified that, while his pain fluctuates, he is "in pain every day" and

tries "to be mobile as much as possible."  Tr. 69.  Plaintiff recalled being "bedridden

three times in a month" where he could not get out of bed due to pain.  Tr. 69.

The ALJ asked Plaintiff how long he could stand before having to walk or sit

down.  Tr. 63.  Plaintiff testified that, roughly, he could stand for between 30 and 40

minutes before needing to sit down.  Tr. 63.  Plaintiff also testified that he could walk

between 100 and 150 yards before needing to sit down.  Tr. 63.  The ALJ similarly asked

Plaintiff how long he could sit before having to shift positions.  Tr. 63.  Plaintiff testified

that he could sit for approximately 20 to 30 minutes.  Tr. 64.  The ALJ contrasted this

testimony with Plaintiff's earlier testimony regarding driving 55 miles, and asked

Plaintiff if he could "push [him]self to sit for about an hour."  Tr. 63-64.  Plaintiff

responded, "I guess if I have to."  Tr. 64.  The ALJ asked Plaintiff whether he thought he

could work at a job where he was sitting for six hours of the day, and could "change

positions, not at will, but every hour for five minutes."  Tr. 72.  Plaintiff testified

"absolutely not" if it was not at will.  Tr. 72.  When the ALJ asked him about the same

sort of position, but he could adjust at will, Plaintiff testified that he did not think he

would be able to do so because of "[t]he concentration and numbness that [he has] in

[his] arms and hands."  Tr. 73.  Plaintiff later testified that he did not think there was

anything he can "do on a daily basis for any sustained period of time, say for an hour or

longer," because he was "always interrupted" by the numbness in his hands or pain, causing him to "lose focus" and "get angry." Tr. 73.

Plaintiff testified that he has trouble lifting and carrying items beyond "a light bag," and could not "bend over and do a deadlift up the floor." Tr. 64. Plaintiff agreed he could lift a gallon of milk, but "[i]t does cause a little bit of back pain." Tr. 64; *but see* Tr. 1225. Plaintiff further testified that he had difficulty with overhead reaching, but would be able to reach out directly in front of him not higher than above the shoulder. Tr. 74.

### 4. Determination of Plaintiff's Residual Functional Capacity

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about his capabilities may be used to support the [residual functional capacity]." *Id.* "Even though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional

capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016).

### a. Evaluation of the Intensity, Persistence & Limiting Effects of Plaintiff's Pain

Plaintiff first argues the ALJ erred in the evaluation of the intensity, persistence, and limiting effects of his pain. When determining a claimant's residual functional capacity, an ALJ takes into account the claimant's symptoms, such as pain, and evaluates the intensity, persistence, and limiting effects of those symptoms. *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029, at *2 (Soc. Sec. Admin. Mar. 16, 2016) [hereinafter SSR 16-3p]; *see, e.g.*, *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017) ("Part of the [residual-functional-capacity] determination includes an assessment of the claimant's credibility regarding subjective complaints.").

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ] examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Such evaluation includes consideration of "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill*,

860 F.3d 1114, 1120 (8th Cir. 2017); *see* 20 C.F.R. § 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.

"Credibility determinations are the province of the ALJ, and as long as good reasons and substantial evidence support the ALJ's evaluation of credibility, [courts] will defer to [the ALJ's] decision." *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016) (quotation omitted); *see Grindley*, 9 F.4th at 630 ("We normally defer to an ALJ's credibility determination."); *Hensley v. Colvin*, 829 F.3d 926, 934 (8th Cir. 2016) ("We will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." (quotation omitted)).

Here, the ALJ concluded that Plaintiff's "alleged limitations are not fully consistent with the record as a whole" and his "subjective complaints of pain and functional limitation, his reported symptomologies, and the effects of [his] pain and medications are inconsistent with the medical evidence as a whole." Tr. 44 (citation omitted). The ALJ noted that while Plaintiff "had lumbar surgery, this was a more conservative procedure, rather than a fusion." Tr. 44. The ALJ also noted that the "MRI findings actually supported improvement in [Plaintiff's] lumbar spine." Tr. 44 (citing Tr. 1431-32 (addressing *cervical* MRI)). As for Plaintiff's "cervical findings," the ALJ noted that "his upper extremity findings were limited to reflexes, with no limitation in sensation or motor strength until recently and with no regularity." Tr. 44. The ALJ noted that Plaintiff "had only very rarely noted straight leg raising test results" and "[t]he majority of his straight leg raising test results were negative." Tr. 44. The ALJ also noted that

Plaintiff "had rare lower extremity findings, which were not consistent," and "had a generally normal gait until very recently with just some noted antalgia." Tr. 44.

The ALJ further found that "the evidence of record supports a greater physical and mental capacity than [Plaintiff] has alleged." Tr. 44. The ALJ noted that Plaintiff

> reported performing his own personal care, living alone/independently, driving, preparing meals, cleaning the dishes, caring for his pet, shopping, selling toys on eBay, attending appointments, reading, writing a book, doing research, watching television, going out on a daily basis into the public on his own, doing the laundry, performing household cleaning tasks, interacting appropriately with authority figures, taking care of his finances, using a computer/smart phone, following written and spoken instructions adequately, doing physical therapy exercises, riding his bike and swimming for 45 minutes, and visiting with family and friends.

Tr. 44.

### i. Explicit Discussion of Each Factor Not Required

The Court begins with Plaintiff's argument that, in evaluating the intensity, persistence, and limiting effects of his pain, "the ALJ did not explicitly list or discuss [all of the] factors contained in SSR 16-3p." Plaintiff's Mem. in Supp. at 14. It is well-settled that the ALJ need not explicitly discuss each factor "as long as [he or she] acknowledges and considers the factors before discounting a claimant's subjective complaints." *Halverson*, 600 F.3d at 932 (quotation omitted); *see, e.g.*, *Grindley*, 9 F.4th at 630; *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019); *Bryant*, 861 F.3d at 782; *Moore v. Astrue*, 527 F.3d 520, 524 (8th Cir. 2009); *Goff*, 421 F.3d at 791-92. The ALJ expressly stated that "all symptoms and the extent to which these symptoms can

reasonably be accepted as consistent with the objective medical evidence and other evidence[ were considered] based on the requirements of 20 CFR 404.1529 and SSR 16-3p." Tr. 39; *see also* Tr. 44 (citing SSR 16-3p). *See Vance*, 860 F.3d at 1120 (8th Cir. 2017) ("An ALJ need not expressly cite the *Polaski* factors when, as here, the judge conducts an analysis pursuant to 20 C.F.R. § 416.929, because the regulation largely mirrors the *Polaski* factors." (quotation omitted)); *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) ("Although the ALJ never expressly cited *Polaski* (which is our preferred practice), the ALJ cited and conducted an analysis pursuant to 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the *Polaski* factors.").

## ii. Consistency of Symptoms with the Objective Medical Evidence

Plaintiff next argues that the ALJ's analysis of the objective medical evidence "evades the true conclusions and diagnoses in the record." Pl.'s Mem. in Supp. at 8. Plaintiff points out the 2018 MRI the ALJ relied on to show improvement in his lumbar spine was actually an MRI of his cervical spine, not his lumbar spine. Plaintiff also points out that Dr. Beck noted the results of a prior MRI in December 2017 showed possible instability at L4-5 and subsequently referred Plaintiff for a possible minimally invasive fusion procedure. Additionally, Plaintiff points to the fact that he was discharged from physical therapy without significant improvement in 2015; was determined to have reached maximum medical improvement in 2015 and restrictions recommended; received an additional diagnosis of post-laminectomy syndrome; and did not experience relief from injections, medication, and additional physical therapy.

Plaintiff likewise argues that the ALJ's reliance on the results of straight-leg-raising tests was inappropriate as "post-laminectomy syndrome . . . does not support presentation with abnormal gait or straight leg raising." Pl.'s Mem. in Supp. at 10. Plaintiff further argues that physical therapy records noted "severely decreased flexibility to the lower extremities," "tightness throughout the musculature of the thoracic spine, decreased trunk stability and palpable tenderness to the entire back area." Pl.'s Mem. in Supp. at 10. Plaintiff concludes that "[a]t a very minimum, the diagnosis of post-laminectomy syndrome, i.e., chronic pain syndrome or failed back surgery . . . , following [his] back surgery . . . supports a finding that Dr. Beck[] determined [his] allegations of pain and limitation are medically credible." Pl.'s Mem. in Supp. at 10.

In considering the intensity, persistence, and limiting effects of a claimant's pain, the ALJ is required to "consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." SSR 16-3p, 2017 WL 5180304, at *5; *see* 20 C.F.R. § 404.1529(a), (c)(2); *see also, e.g.*, *Grindley*, 9 F.4th at 630; *Halverson*, 600 F.3d at 931.

The Court agrees with Plaintiff that the ALJ's conclusion that there was improvement in Plaintiff's *lumbar* spine based on impressions from a *cervical* MRI is not supported by substantial evidence in the record as a whole.[15] The Commissioner

---

[15] It is possible that the ALJ misicted the particular MRI on which she was relying. In the ALJ's discussion of the medical evidence, she noted that a 2015 "MRI after lumbar surgery was noted as looking fine" and "another lumbar MRI in December 2017. . . did not show severe neural impingement, confirmed [Plaintiff's] prior surgery, and did not show any recurrence," but "demonstrated facet arthropathy, bilateral at L4-5, and indicated as moderate to marked." Tr. 40. The ALJ also observed that, in January 2018, Plaintiff "was noted as not having anything new or

42

contends that "[a]lthough Plaintiff argues that the ALJ misstates the record about this MRI, a review of the report the ALJ referenced explicitly states 'there is nothing really alarming about his MRI and nothing surgical.'"  Comm'r's Mem. in Supp. at 21 (quoting Tr. 1432) (citation omitted).  While Dr. Beck did comment that "[t]here is really nothing alarming about [P]laintiff's MRI and nothing surgical," Tr. 1432, this comment was in reference to Plaintiff's *neck pain* and the *cervical* MRI, not Plaintiff's lumbar spine and low back pain.  Indeed, just prior to this comment Dr. Beck commented on the specific findings of the cervical MRI, including that Plaintiff "ha[d] a little synovial cyst at C4-5 on the right which is incidental."  Tr. 1432; *see also* Tr. 1381-82 (findings and impression of August 2018 cervical MRI).

But, while the Court concludes that this specific finding is not supported by substantial evidence in the record as a whole, the same cannot be said for the rest of the ALJ's analysis regarding the objective medical evidence and the ALJ's overall conclusion that the intensity, persistence, and limiting effects of Plaintiff's pain was not consistent to the degree alleged with the objective medical evidence based on varying presentations with respect to his upper and lower extremities, straight-leg-raising test results, and gait.    To be sure, there is not really any dispute that Plaintiff experiences pain.  *See Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir.1999) ("As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is." (quotation omitted)).    The ALJ acknowledged

acute findings on his lumbar MRI."  Tr. 40.  The ALJ further observed that "[d]espite the minimal MRI findings, [Plaintiff's] doctor referred [him] to neurosurgery for a possible L4-5 fusion."  Tr. 40.

Plaintiff's ongoing complaints of back pain when discussing the objective medical evidence, and noted places in the record where Plaintiff experienced tenderness upon examination, reduced range of motion, diminished reflexes, some reduced strength, and an antalgic gait. Tr. 40. At the same time, the ALJ correctly observed that repeat imaging following Plaintiff's back surgery generally contained mild to moderate findings and Plaintiff was also documented as having close to if not full strength in his extremities, full reflexes, negative straight-leg-raising, and intact sensation. Tr. 40. *See Swink v. Saul*, 931 F.3d 765, 771 (8th Cir. 2019).

In the end, Plaintiff is essentially asking this Court to reweigh the objective medical evidence, which this Court may not do. *See Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *see also Dols v. Saul*, 931 F.3d 741, 746 (8th Cir. 2019) ("It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." (quotation omitted)). It is not surprising that Plaintiff is able to point to some evidence in a record of just over 1,400 pages that supports a different conclusion than the one reached by the ALJ in this case. *See, e.g.*, *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("[I]t is not surprising that, in an administrative record which exceeds 1,500 pages, Fentress can point to some evidence which detracts from the Commissioner's determination."). But, "[r]eversal is not warranted, however, merely because substantial evidence would have supported an opposite conclusion." *Grindley*, 9 F.4th at 627 (quotation omitted); *see Perks*, 687 F.3d at 1091; *Boettcher*, 652 F.3d at 863.

The Court recognizes that a claimant's symptoms cannot be discounted "solely because the objective medical evidence does not fully support them."[16]  *Bernard v. Colvin*, 774 F.3d 482, 488 (8th Cir. 2014) (quotation omitted); *see* 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2016 WL 1119029, at *4-5; *see also, e.g.*, *Grindley*, 9 F.4th at 630; *Halverson*, 600 F.3d at 931-32.  But, inconsistency with the objective medical evidence is one factor the ALJ is required to consider in evaluating the intensity, persistence, and limiting effects of those symptoms.  SSR 16-3p, 2016 WL 1119029, at *5; *see* 20 C.F.R. § 404.1529(a), (c); *see also, e.g.*, *Grindley*, 9 F.4th at 630; *Halverson*, 600 F.3d at 931-32.  Regardless of whether this Court might have reached the same conclusion as the ALJ, it cannot be said on this record that the conclusion that Plaintiff's statements about the intensity, persistence, and limiting effects of his pain were not fully consistent with the objective medical evidence was outside the available zone of choice.  *Pierce v. Kijakazi*, 22 F.4th 769, 772 (8th Cir. 2022); *see also, e.g.*, *Grindley*, 9 F.4th at 627; *Fentress*, 854 F.3d at 1119-20; *Perks*, 687 F.3d at 1091.

### iii.  Daily Activities

A claimant's daily activities is evidence outside of the objective medical evidence that an ALJ may consider as a factor when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms.  20 C.F.R. § 404.1529(c)(3)(i); SSR 16-3p, 2016 WL 1119029, at *7; *see also, e.g.*, *Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain.").  "[A]cts such as cooking,

---

[16] And as will be discussed momentarily, here they were not.  *See infra* Section IV.C.4.a.iii.

vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Halverson*, 600 F.3d at 932 (quotation omitted); *see also, e.g.*, *Swarthout*, 35 F.4th at 612 ("The ALJ reasonably concluded that other daily activities—caring for personal hygiene, managing medications, preparing simple meals, stretching and performing gentle exercises, watching television, reading the newspaper, going for short walks outside, riding a bike, driving, handling money, doing some laundry, and doing some household chores in short increments—provided evidence that Swarthout is not as limited as she has alleged." (quotation omitted)); *Wright v. Colvin*, 789 F.3d 847, 854 (8th Cir. 2015) ("Wright himself admits to engaging in daily activities that this court has previously found inconsistent with disabling pain, such as driving, shopping, bathing, and cooking."); *Ponder v. Colvin*, 770 F.3d 1190, 1195 (8th Cir. 2014) ("Ponder's activity level undermines her assertion of total disability. Indeed, Ponder admitted that she, among other things, performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family."); *Wagner v. Astrue*, 499 F.3d 842, 852 (8th Cir. 2007) ("Wagner engaged in extensive daily activities, such as fixing meals, doing housework, shopping for groceries, and visiting friends.").

Here, the ALJ found that Plaintiff's activities "support[ed] a greater physical and mental capacity than [Plaintiff] has alleged." Tr. 44. As stated above, the ALJ noted that Plaintiff

> reported performing his own personal care, living alone/independently, driving, preparing meals, cleaning the dishes, carrying for his pet, shopping, selling toys on eBay, attending appointments, reading, writing a book, doing research, watching television, going out on a daily basis into the public on his own, doing the laundry, performing household cleaning tasks, interacting appropriately with authority figures, taking care of his finances, using a computer/smart phone, following written and spoken instructions adequately, doing physical therapy exercises, riding his bike and swimming for 45 minutes, and visiting with family and friends.

Tr. 44. The ALJ concluded that "[t]his range of activities" was not consistent with "the degree of limitation alleged" by Plaintiff. Tr. 44.

Plaintiff asserts that his daily activities were completed "sitting and standing and multitask[ing]" with "breaks as needed." Pl.'s Mem. in Supp. at 11; *see also* Pl.'s Reply at 3. Plaintiff also asserts that some of these activities were more limited and subsequently ceased. For example, he could only bike for approximately 5 minutes, stopped swimming as of June 2016, and quit selling items on eBay.[17]

"[I]t is well-settled law that "a claimant need not prove []he is bedridden or completely helpless to be found disabled." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)). Yet, a claimant's daily activities are *a factor* to be considered in evaluating allegations of disabling pain, *Swarthout*, 35 F.4th at 612, and the Eighth Circuit Court of Appeals has repeatedly held that the types of activities Plaintiff engages in are inconsistent with an allegation of total disability. *See, e.g.*, *Swarthout*, 35 F.4th at 612; *Swink*, 931 F.3d at 770; *Bryant*, 861 F.3d

---

[17] While Plaintiff also asserts that "[t]his was done prior to his onset date," Plaintiff told his primary care provider in mid-September 2015, approximately nine months after his alleged December 2014 onset date, that he was getting "back into his hobby interest of selling his toys on eBay." Tr. 413; *accord* Tr. 562.

at 782; *Wright*, 789 F.3d at 854; *Ponder*, 770 F.3d at 1195; *Halverson*, 600 F.3d at 932. The ALJ did not err in considering Plaintiff's activities as one factor in concluding that his pain was not as limiting as alleged.

### b. Opinion Evidence & Five-Minute Sit/Stand Option

Plaintiff argues that the ALJ's conclusion that he could perform sedentary work with 5-minute sit/stand limitation every hour is not supported by substantial evidence in the record as a whole and inconsistent with the opinions of Drs. Beck, Kuhnlien, and Matos,[18] which were not properly considered by the ALJ. Plaintiff argues that the ALJ "did not specify what medical evidence supported this finding of the need to stand for five minutes versus some other number of minutes" and "[i]t is entirely unclear where [this five-minute sit/stand limitation] derives [from] as the ALJ did not address it, [but] simply rejected the opinions that found greater restrictions." Pl.'s Mem. in Supp. at 13. Plaintiff further argues that Drs. Beck, Kuhnlein, and Matos "all similarly concluded based on treatment, physical examinations and review of records that [he] was incapable of sitting frequently." Pl.'s Mem. in Supp. at 16.

### i. Sedentary Work

As stated above, "a sedentary job is defined as one which involves sitting." 20 C.F.R. § 404.1567(a); *accord Titles II and XVI: Determining Capability to Do Other Work—Implications of a Residual Functional Capacity for Less Than a Full Range of*

---

[18] The little weight assigned by the ALJ to the opinions of the state agency medical consultants is not being challenged. Tr. 42.

*Sedentary Work*, SSR 96-9p, 1996 WL 374185, at *3 (Soc. Sec. Admin. July 2, 1996)

[hereinafter SSR 96-6p].

> In order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded.

SSR 96-6p, 1996 WL 374185, at *6. "Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a); *accord* SSR 96-6p, 1996 WL 374185, at *3.

> The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday. If an individual can stand and walk for a total of slightly less than 2 hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. For individuals able to stand and walk in between slightly less than 2 hours and only a few minutes, it may be appropriate to consult a vocational resource.

SSR 96-9p, 1996 WL 374185, at *6.

SSR 96-9p recognizes that

> [a]n individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking) periodically. Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded. The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The

> [residual-functional-capacity] assessment must be specific as
> to the frequency of the individual's need to alternate sitting
> and standing. It may be especially useful in these situations
> to consult a vocational resource in order to determine whether
> the individual is able to make an adjustment to other work.

*Id.* at *7.

### ii.  Evaluating the Opinions of Drs. Beck, Kuhnlein & Matos

There is no dispute that Drs. Beck, Kuhnlein, and Matos are acceptable medical sources. *See* 20 C.F.R. § 404.1502(a)(1) (including "[l]icensed physician (medical or osteopathic doctor)" as an acceptable medical source). Opinions from acceptable medical sources are statements from physicians about the nature and severity of a claimant's impairments, including any symptoms, diagnosis, and prognosis; what the claimant is still able to do despite the impairments; and any physical restrictions. 20 C.F.R. § 404.1527(a)(1).[19] These opinions are weighed according to a number of factors set forth in 20 C.F.R. § 404.1527(c), including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion.

In determining whether a claimant is disabled, the ALJ considers the medical opinions along with the other evidence in the record. 20 C.F.R. § 404.1527(b); *Wagner*, 499 F.3d at 848. The ALJ is tasked with resolving conflicts among the various medical opinions and "may reject the conclusions of any medical expert, whether hired by the

---

[19] Plaintiff's application was filed before March 27, 2017. *See generally* 20 C.F.R. § 404.1527.

claimant or the government, if they are inconsistent with the record as a whole." *Wagner*, 499 F.3d at 848 (quotation omitted). Regardless of its source, every medical opinion received is to be evaluated. 20 C.F.R. § 404.1527(c); *Miller v. Colvin*, 784 F.3d 472, 478 (8th Cir. 2015).

Dr. Beck is a treating source. *See* 20 C.F.R. § 404.1527(a)(2) ("Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you."). A treating source's "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin*, 826 F.3d at 1088; *accord Grindley*, 9 F.4th at 632; *Cline*, 771 F.3d at 1103. "Yet[, this controlling] weight is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *accord Pierce*, 22 F.4th at 772; *see Grindley*, 9 F.4th at 632 ("The record must be evaluated as a whole to determine whether the treating physician's opinion should control." (quotation omitted)). The opinions of treating sources "are given less weight if they are inconsistent with the record as a whole or if the conclusions consist of vague, conclusory statements unsupported by medically acceptable data." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see Cline*, 771 F.3d at 1103 (permitting the opinions of treating physicians to be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions" (quotation omitted)). When a treating

source's opinion is not given controlling weight, the opinion is weighed based on the factors set forth in § 404.1527(c)(2) through (6). 20 C.F.R. § 404.1527(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *Cline*, 771 F.3d at 1103.

***Five-Minute Sit/Stand Option.*** Dr. Beck first opined that Plaintiff could stand for no more than 20 minutes in a four-hour workday and later opined that he "should limit his sitting, standing, walking to 30 minutes at a time with breaks." Tr. 1162, 599. Dr. Kuhnlein opined that Plaintiff should be able to sit, stand, and walk at will, without imposing a time limitation. Tr. 1230. Dr. Matos opined that Plaintiff had the ability to stand occasionally, sit occasionally, and walk occasionally, without opining as to any need to alternate between positions. Tr. 1234, 1251. As stated above, the ALJ limited Plaintiff to sedentary work with a "need to alternate from sitting to standing for five minutes every hour." Tr. 39.

Were Plaintiff's assertion of error merely about the amount of time Plaintiff needed to stand, five minutes or some other duration, the outcome of this case may well be different. When given a hypothetical by the ALJ of an individual who could perform a reduced range of sedentary work and "needed to alternate from sitting to standing for five minutes every hour," the vocational expert testified that such an individual could perform the representative jobs of optical-goods polisher, circuitry-image inspector, and laminator. Tr. 78. When the ALJ changed the hypothetical to a "need[] to alternate from sitting to standing for five minutes every 30 minutes," the vocational expert testified that

> [t]he way these jobs are performed would all be like bench style jobs, using a stool so alternating positions wouldn't really take them off-task in itself. It would be more about whether the person could stay on task, you know, based on the frequency of them moving. So I think as typically performed, if someone is able to alter positions without going off-task, at least not very much, I think the jobs would all be fine in the numbers I gave.

Tr. 80. As the Commissioner points out, the vocational expert's testimony arguably "could support a finding of sitting or standing as needed." Comm'r's Mem. in Supp. at 28. Thus, even assuming for the sake of argument that the ALJ erred by not sufficiently explaining why Plaintiff "need[ed] to stand for five minutes versus some other number of minutes," such an error would appear to be harmless.

***Ability to Sit for Six Hours.*** Plaintiff additionally argues, however, that the ALJ's conclusion that he was capable of sitting for a sufficient duration to perform sedentary work is not supported by substantial evidence. The Court agrees.

Again, Dr. Beck first opined that Plaintiff could stand for no more than 20 minutes in a four-hour workday, thus arguably sitting for the remining three-and-a half hours or so, and later opined that Plaintiff "should limit his sitting, standing, walking to 30 minutes at a time with breaks." Tr. 1162, 599. Dr. Kuhnlein opined that Plaintiff should be able to sit, stand, and walk at will, without imposing a time limitation. Tr. 1230. Dr. Matos opined that Plaintiff had the ability to sit occasionally. Tr. 1234, 1251.

Recall that "in order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour

intervals." SSR 96-6p, 1996 WL 374185, at *6; *see also Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005). "If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded." SSR 96-6p, 1996 WL 374185, at *6.

The ALJ gave little weight to the limitations Drs. Beck, Kuhnlien and Matos placed on Plaintiff's ability to sit. Tr. 41, 42. As for Dr. Beck, the ALJ found that the "positional changes" were "overly restrictive in light of the lack of consistent straight leg raising test results and continued somewhat conservative treatment after [Plaintiff's] laminectomy." Tr. 41. With respect to Dr. Matos, the ALJ gave "great weight to the occasional standing and walking limitations," but "little weight to the remainder of [Dr. Matos's] opinion as it is overly restrictive in light of the generally negative straight leg raising test results, inconsistent and rare reflex and strength findings, and [Plaintiff's] primarily conservative treatment." Tr. 41-42. The ALJ likewise found "[t]he need to sit or stand as needed" in Dr. Kuhnlein's opinion to be "overly restricting in light of the lack of consistent physical examination findings." Tr. 42.

It is not clear what the results of straight-leg raise testing have to do with Plaintiff's ability to sit for approximately six hours in an eight-hour day. The purpose of the straight-leg raise test[20] is "to detect spinal nerve-root irritation." David A. Morton III, M.D., *Social Security Disability Medical Tests* § 11.33 (2015) (straight leg raising test); *see also StatPearls*. "The test stretches the sciatic nerve, which arises from the fourth

---

[20] "The straight leg raise test . . [is] also called the Lasegue test . . . ." *Straight Leg Raise Test*, *StatPearls*, available at Nat'l Ctr. for Biotechnology Info., Nat'l Lib. of Med., Info., https://www.ncbi.nlm.nih.gov/books/NBK539717/ (last visited July 20, 2022) [hereinafter *StatPearls*].

and fifth lumbar nerve roots and the first, second, and third sacral nerve roots. The sciatic nerve is a large nerve branching into other nerves that supply the lower extremity." *Social Security Disability Medical Tests* § 11.33.

> A positive straight leg raising test . . . results from gluteal or leg pain by passive straight leg flexion with the knee in extension, and it may correlate with nerve root irritation and possible entrapment with decreased nerve excursion. This clinical neurological test has high sensitivity and low specificity, being an important diagnostic workup in patients with lower back pain and suspected radiculopathy.

*StatPearls*. "Straight leg raise test is an important physical examination finding during primary care to assess the need for imaging studies such as X-rays and MRI, and the potential need for a referral from primary care to a spine specialist." *Id.* It also helps guide treatment options, such as "a nerve root injection or surgery." *Id.* Thus, while it could be reasonably inferred from varying straight-leg-raise test results that Plaintiff's pain may "not have been as severe or debilitating as he . . . . claimed," *Pierce*, 22 F.4 at 772, *see also supra* Section IV.C.4.a.ii, it is less clear what the results of straight-leg raise testing have to do with Plaintiff's ability to sit for approximately six hours in an eight-hour day. The same is true with respect to the reflex and strength findings the ALJ relied upon. An "ALJ may not simply draw his [or her] own inferences about [a claimant's] functional ability from medical reports." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Koch v. Kijakazi*, 4 F.4th 656, 667 (8th Cir. 2021).

Nor is it clear in this case how Plaintiff's course of treatment suggested he had a greater ability to sit than opined by Drs. Beck, Matos, and Kuhnlein. Prior to having surgery, Plaintiff first underwent an epidural steroid injection and proceeded to surgery

after the injection did not relieve his pain.  This was not mentioned by the ALJ.  While the ALJ acknowledged that Plaintiff "was treated generally with physical therapy" after his surgery, Plaintiff was discharged from physical therapy after more than 20 sessions without significant improvement.  Following surgery, Plaintiff experienced minimal relief from medication.  And, while the ALJ noted that Plaintiff was ultimately referred for a second surgery, the record reflects that Dr. Beck was "really . . . hesitant" to do the surgery because of Plaintiff's weight and subsequently recommended that Plaintiff see another provider so that the surgery could be performed in a minimally invasively manner.  The Court recognizes that "an ALJ is not required to discuss every piece of evidence submitted" and the "failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).  At the same time, viewing the record as a whole, the Court struggles to see how minimal relief from medication, numerous sessions of physical therapy without improvement, and a second recommended surgery reflect a conservative course of treatment supporting the ALJ's conclusion that Plaintiff's ability to sit was greater than the limitations opined by Drs. Beck, Kuhnlein, and Matos.  *Contra Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (claimant did not seek medical treatment for pain for four years and relied on a conversative course of treatment of exercises and medication).

The Commissioner contends that "20 to 30 minutes of continuous walking or standing is more than enough for sedentary work.  Comm'r's Mem. in Supp. at 27.  But, what about the sitting limitation imposed by Dr. Beck?  Dr. Beck opined that Plaintiff was limited to *sitting* for 30 minutes at a time with breaks.  Sedentary work generally

requires that an individual be able to sit for approximately two hours at a time.  *See* SSR 96-9p, 1996 WL 374185, at *6; *Ellis*, 392 F.3d at 996.  The Commissioner similarly contends that Dr. Matos opined that Plaintiff could stand and walk for a total of two-thirds of an eight-hour day, which is "far more standing and walking abilities than what sedentary work involves."  Comm'r's Mem. in Supp. at 27.  Again, what about the sitting limitation imposed by Dr. Matos?  Dr. Matos opined that Plaintiff could only sit *occasionally*, up to one-third of the work day.  The Commissioner contends that "Dr. Matos'[s] use of the . . . term occasional" was "vague."  Comm'r's Mem. in Supp. at 27.  Notably, Dr. Matos defined his use of the term "occasional" in a similar manner to the Social Security Administration.  *Compare* Tr. 1234 ("Occasionally = 1/3 of time") *with Titles II & XVI: Determining Capability to Do Other Work—The Medical-Vocational Rules of Appendix 2*, SSR 83-10, 1983 WL 31251, at *5 (Soc. Sec. Admin. 1993) ("'Occasionally' means occurring from very little up to one-third of the time.").  Sedentary jobs, by their very nature, involve frequent rather than occasional sitting.  The Court is left to speculate how the straight-leg-raise test results and Plaintiff's "conservative" course of treatment demonstrate that Plaintiff had a greater ability to sit than opined by three examining physicians.

The Commissioner further contends that "[t]he record showed Plaintiff frequently used sitting to reduce his pain."[21]  Comm'r's Mem. in Supp. at 28.  An ALJ may assign

---

[21] The Commissioner's comment that "[a]n obese person also prefers sitting most of the day" is inappropriate.  Comm'r's Mem. in Supp. at 27.  *See Titles II and XVI: Evaluation of Obesity*, SSR 02-1p, 2002 WL 34686281, at *6 (Soc. Sec. Admin. Sept. 12, 2002) ("However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments.") [hereinafter SSR 02-1p]; *see also Titles II and XVI: Evaluating Cases Involving Obesity*, SSR 19-2p, 2019 WL 2374244, at *5 (Soc. Sec. Admin. May 20, 2019)

less weight to a medical opinion when a claimant demonstrates greater functionality in his or her daily activities.  *See, e.g.*, *Schwandt*, 926 F.3d at 1011; *Fentress*, 854 F.3d at 1021; *Hacker v. Barnhart*, 459 F.3d 934, 937-38 (8th Cir. 2006); *see also* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").  It may be that Plaintiff demonstrates a greater ability to sit in his daily activities and that sitting is a method Plaintiff uses to relieve pain, and thus for these (or some other) reasons the limitations on Plaintiff's ability to sit opined by Drs. Beck, Kuhnlein and Matos were inconsistent with other substantial evidence.  But, that is not the reasoning proffered by the ALJ when explaining the weight assigned to their opinions.  The Court cannot accept the Commissioner's *post hac* rationalization.  *See Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 715 n.7 (8th Cir. 1979) ("It is well established that an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of appellate counsel.").  It is not the role of this Court to speculate on the reasons that might have supported the ALJ's decision or supply a reasoned basis for that decision that the ALJ never gave.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016); *accord Nebraska v. U.S. Envtl. Prot. Agency*, 812 F.3d 662, 666 (8th Cir. 2016); *see also Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 420 (1992) ("We recognize the well-

_____

(effective May 20, 2019) ("We will not make general assumptions about the severity or functional effects of obesity combined with another impairment(s).") [hereinafter SSR 19-2p].  "Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as *sitting*, standing, walking, lifting, carrying, pushing, and pulling."  SSR 02-1p, 2002 WL 34686281, at *6 (emphasis added); *see also* SSR 19-2p, 2019 WL 2374244, at *4 ("A person may have limitations in any of the exertional functions, which are *sitting*, standing, walking, lifting, carrying, pushing, and pulling." (emphasis added)).

established rule that an agency's action may not be upheld on grounds other than those relied on by the agency." (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943))).

Accordingly, the Court concludes that the ALJ's treatment of the opinions of Drs. Drs. Beck, Kuhnlein and Matos is not supported by substantial evidence in the record as a whole. In light of this conclusion, the Court recommends that Plaintiff's motion be granted in part and denied in part; the Commissioner's motion be granted in part and denied in part; the ALJ's residual-functional-capacity determination and decision be vacated as to steps four and five; and this matter be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

[Continued on next page.]

## V. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 28, be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 30, be **GRANTED IN PART** and **DENIED IN PART**.

3. The ALJ's residual-functional-capacity determination and decision be **VACATED** as to steps four and five.

4. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings.

Dated: July___26___, 2022                    _____*s/ Tony N. Leung*_____
                                             Tony N. Leung
                                             United States Magistrate Judge
                                             District of Minnesota


                                             *Gerald L. v. Kijakazi*
                                             Case No. 20-cv-1352 (KMM/TNL)


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).